**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,<br>Tribal Business Center<br>Pima Avenue<br>Fort Hall, ID 83203,<br><br>Plaintiff,<br><br>v.<br><br>RYAN ZINKE,<br>Secretary of the U.S. Dep't of Interior<br>1849 C Street, NW<br>Washington, D.C. 20240,<br><br>and<br><br>MICHAEL S. BLACK,<br>Acting Assistant Secretary-Indian Affairs<br>1849 C Street, NW<br>Washington, D.C. 20240,<br><br>and<br><br>UNITED STATES OF AMERICA<br><br>Defendants. | ) | Case No.: 17-954 |

**COMPLAINT**

The Shoshone-Bannock Tribes of the Fort Hall Reservation ("Tribes"), by and through their attorneys Sonosky, Chambers, Sachse, Endreson & Perry, LLP, complain and allege as follows:

## I. INTRODUCTION & SUMMARY

1. This action involves the failure of the Secretary of the Interior ("Secretary") to pay the Tribes in full so-called "pre-award" costs and "start-up" costs in fiscal year ("FY") 2010 for the Tribes' law enforcement program and the Tribes' adult and juvenile corrections program – costs which were fully negotiated and approved, and never properly declined by the Secretary.

2. Over the course of more than two years, the Tribes and the Bureau of Indian Affairs ("BIA") negotiated and ultimately entered into two separate, expanded "self-determination" contracts for the law enforcement and corrections programs under Title I of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. §§ 5301-5399 – in part to accommodate the BIA's request to separate law enforcement and corrections into distinct contracts, and in part because the Tribes had constructed a new, state-of-the-art Tribal Justice Center in Fort Hall to expand law enforcement and corrections program activity, including assuming juvenile corrections services.

3. As part of these negotiations and in accordance with the ISDEAA, the Tribes carefully negotiated and reached agreement with the designated BIA Awarding Official on specific budget amounts for each item of the pre-award costs and start-up costs for each of the expanded contracts. The Tribes' final contract proposals included these carefully negotiated and agreed-upon budgets.

4. By law and under the terms of each contract, the Secretary was required to pay the full pre-award and start-up cost funding. However, the Secretary paid the Tribes only 33.2% of the full, agreed upon amount. The Secretary also failed to issue any timely "declination" of any

of the Tribes' proposed pre-award and start-up cost budget, which is required under the ISDEAA if the Secretary pays less than the full funding amount proposed by an Indian tribe.

5. The Tribes seek as damages the unpaid funds that the Secretary was legally obligated to pay under the ISDEAA and the terms of its self-determination contracts. These are the sums necessary to put the Tribes back in the position in which they would have been, had the Secretary not breached his statutory and contractual duties.

## II. JURISDICTION

6. This Court has jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331, 1362, and 25 U.S.C. §§ 5331(a), (d) of the ISDEAA.

7. This Court has additional jurisdiction over this suit pursuant to 41 U.S.C. §§ 7103–7107 of the Contract Disputes Act ("CDA").

8. The Tribes have satisfied the exhaustion requirement of the CDA. *See* 41 U.S.C. § 7103(f). In accordance with the CDA, the Tribes submitted claims for full payment of these costs to the contracting officer – in this case, the BIA Awarding Official – on May 13, 2014. The claims were certified as received by the BIA on May 16, 2014. The BIA Awarding Official "administratively stayed" decision on the claims on May 27, 2014, again on April 25, 2016, and then postponed decision again on September 22, 2016. The BIA Awarding Official has not issued a final decision on the claims – either within 60 days or within a reasonable amount of time thereafter. Therefore, the Tribes may now deem the claims denied under the CDA and appeal to this Court. *See* 41 U.S.C. § 7103(f)(5); *Tuba City Reg'l Health Care Corp. v. United States*, 39 F. Supp. 3d 66, 70-71 (D.D.C. 2014) (Tribal contractor's claims deemed denied after Indian Health Service failed to respond within a reasonable period of time (citing *Claude E.*

*Atkins Enters., Inc. v. United States*, 27 Fed. Cl. 142, 145 (1992) (contractor may deem claims denied if contracting officer attempts to extend period to issue a decision a second time after the initial 60-day period has expired)).

## III. PARTIES

9. The Shoshone-Bannock Tribes of the Fort Hall Reservation are a federally recognized Indian Tribe with their Tribal headquarters in Fort Hall, Idaho. The Tribes are a "Tribe" as that term is defined by the ISDEAA at 25 U.S.C. § 5304(e).

10. Ryan Zinke is the Secretary of the Interior. Secretary Zinke exercises delegated responsibilities from Congress pursuant to the ISDEAA and other applicable law.

11. Michael S. Black is the Acting Assistant Secretary-Indian Affairs. Acting Assistant Secretary Black exercises authority delegated to him by the Secretary to carry out the Secretary's responsibilities under the ISDEAA and other applicable law.

12. As used throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "BIA," "Government," and "the agency" are used interchangeably.

## IV. FACTS AND GENERAL ALLEGATIONS

### A. Purposes of the ISDEAA.

13. In passing the ISDEAA, Congress found that "the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities." 25 U.S.C. § 5301(a)(1).

14. In response to these stated concerns, Congress passed the ISDEAA and declared "its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities." 25 U.S.C. § 5302(b).

15. It is the Secretary's policy under the ISDEAA to "facilitate" and "encourage" tribal contracting of federal programs for the benefit of Indians. 25 C.F.R. § 900.3(b)(1), (2).

**B. Tribal Contract Proposals Under the ISDEAA.**

16. Under Title I of the ISDEAA, "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract," Congress requires the Secretary to contract with the tribe to plan, conduct, and administer the programs that otherwise would be administered by the Secretary. 25 U.S.C. § 5321(a)(1).

17. When a tribe submits a proposal for a new or expanded self-determination contract, or to amend an existing self-determination contract, the Secretary has ninety days to review that proposal. 25 U.S.C. § 5321(a)(2). Within ninety days of receiving the proposal, the Secretary must approve the proposal and award the contract, or issue a written "declination" decision, as described in 25 U.S.C. § 5321(a)(2) and 25 C.F.R. § 900.22.

### C. The Requirements for Declining an ISDEAA Contract Proposal.

18. If the Secretary does not approve a tribe's contract proposal under the ISDEAA within 90 days, then the Secretary must provide:

> written notification . . . that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that—
>
> (A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
>
> (B) adequate protection of trust resources is not assured;
>
> (C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
>
> (D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 5325(a) of this title; or
>
> (E) the program, function, service, or activity (PFSA) (or portion thereof) that is the subject of the proposal is beyond the scope of [PSFAs covered by the Act] because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 5321(a)(2); *accord* 25 C.F.R. § 900.22.

19. If the Secretary declines a tribal contract proposal, the Secretary must still approve "any severable portion of a contract proposal that does not support a declination finding." *See* 25 U.S.C. 5321(a)(4); 25 C.F.R. § 900.25.

20. If a tribal contract proposal exceeds the applicable funding level, the Secretary "is required . . . to approve a level of funding that is authorized under section 106(a) of the Act." 25 C.F.R. § 900.26; *see also* 25 U.S.C. 5321(a)(4).

21. When the Secretary declines all or a severable part of a tribal contract proposal, the Secretary must also "state any objections in writing to the tribal organization." 25 U.S.C. 5321(b)(1). The Secretary is required:

> [t]o advise the Indian tribe or tribal organization in writing of the Secretary's objections, including a specific finding that clearly demonstrates that (or that is supported by a controlling legal authority that) one of the conditions set forth in § 900.22 exists, together with a detailed explanation of the reason for the decision to decline the proposal and, within 20 days, any documents relied on in making the decision . . . .

25 C.F.R. § 900.29(a).

22. The Secretary must also provide technical assistance to overcome the stated objection. 25 U.S.C. § 5321(b)(2); 25 C.F.R. § 900.30.

23. If the Secretary fails to properly decline a contract proposal, it is "deemed approved" by operation of law:

> A proposal that is not declined within 90 days (or within any agreed extension under § 900.17) is deemed approved and the Secretary shall award the contract or any amendment or renewal within that 90-day period and add to the contract the full amount of funds pursuant to section 106(a) of the Act.

25 C.F.R. § 900.18. *See also Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*, 945 F. Supp. 2d 135, 145 (D.D.C. 2013) (holding that proposed tribal contract amendments "became effective when the Secretary failed to respond within 90 days"); *Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1068 (D.S.D. 2007) (holding a contract "deemed approved by operation of law" where the Secretary failed to elaborate on any declination criteria); *Puyallup Tribe of Indians v. Bureau of Indian Affairs*, 63 IBIA 10, 11 (Apr. 8, 2016) ("Because BIA failed to meet its obligation [to issue a declination decision] within the requisite time period, the regulations require that the Tribe's proposed pre-award and start-up costs be

'deemed approved,' and that the requested funding be awarded in full."); *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Bureau of Indian Affairs, Dep't of Interior*, 61 IBIA 98, 99 (Jul. 15, 2015) ("Neither ISDA nor the ISDA regulations afford BIA a second bite at the apple to explain why a Tribe's contract proposal should not or cannot be awarded, whether as a matter of fact or law, after the 90-day deadline has expired. The regulations are clear in stating the consequences if BIA chooses to disregard the deadline: the proposal is deemed approved and the contract shall be awarded.").

**D. The Secretary's Obligation to Pay ISDEAA Contracts in Full.**

24. Once a self-determination contract is approved, the Secretary is obligated to pay the tribe the full amount of funds due under the contract. *See* 25 U.S.C. § 5325(g) ("Upon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled . . . .").

25. The model contract in Title I of the ISDEAA requires the Secretary to "make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference" to the contract. 25 U.S.C. § 5329(c) (Model Agreement § (b)(4)). The funding amount "shall not be less than the applicable amount determined pursuant to section 106(a) of the Indian Self-Determination and Education Assistance Act." *Id.*

26. The Tribes' FY 2010 law enforcement and corrections contracts also include this same "model contract" language requiring full payment. *See* Contract No. CTP04T18048 § (b)(4); Contract No. CTP04T18049 § (b)(4).

**E. The Secretary's Requirements for Providing Pre-Award Costs, Start-up Costs, and other Contract Support Costs, in Addition to Program Funding.**

27. The ISDEAA provides that tribes who choose to contract for the operation of federal programs shall be paid two main types of funding. First, tribal contractors are entitled to be paid the Secretary's program funds. 25 U.S.C. § 5325(a)(1). Second, tribal organizations are entitled to be paid "contract support costs," or CSCs. 25 U.S.C. § 5325(a)(2), (3), (5), (6).

28. The first type of funding – also called the "Secretarial amount" – represents "the amount the Secretary would have expended had the government itself [continued to] run the program." *Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 629 F.3d 1296, 1298–99 (Fed. Cir. 2010), *vacated on other grounds*, 133 S. Ct. 22 (2012); *see also* 25 U.S.C. § 5325(a)(1).

29. In addition to the "Secretarial amount," the ISDEAA also requires the Secretary to pay CSCs. Subsection 5325(a)(2) describes the CSC funding requirement as follows:

> There shall be added to the amount required by paragraph (1) [*i.e.* to the Secretarial amount required by 25 U.S.C. § 5325(a)(1)] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management . . . .

25 U.S.C. § 5325(a)(2).

30. "Contract support costs" include, but are not limited to, "indirect administrative costs, such as special auditing or other financial management costs," *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 635 (2005) (citing 25 U.S.C. § 5325(a)(3)(A)(ii)), and certain "direct costs, such as workers' compensation insurance" for certain costs attributable directly to the personnel and facilities covered by the program funds, *id.* at 635 (citing 25 U.S.C. § 5325(a)(3)(A)(i)).

31. Most relevant to the Tribes' claims here, "contract support costs" under the ISDEAA also include "during the initial year that a self-determination contract is in effect" or "before that initial year":

> the reasonable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract necessary—
>
> (A) to plan, prepare for, and assume operation of the program, function, service, or activity that is the subject of the contract; and
>
> (B) to ensure compliance with the terms of the contract and prudent management.

25 U.S.C. § 5325(a)(5)-(6). These costs are known as "pre-award" and "start-up" costs, and the Secretary is required to pay them on a one-time, non-recurring basis whenever a tribe enters into a new or expanded self-determination contract. *Id.*

32. During the fiscal year at issue here (FY 2010), BIA considered CSC proposals – including pre-award funding, start-up funding, and initial-year CSC funding – pursuant to a BIA National Policy Memorandum. *See* U.S. Dep't of the Interior, Bureau of Indian Affairs, NPM-SELFD-1, NATIONAL POLICY MEMORANDUM (2006) (the "BIA Policy").

33. Under this BIA Policy, a tribe entering into a new or expanded contract under the ISDEAA would negotiate a detailed pre-award budget and start-up budget with the designated BIA Awarding Official. *See* BIA Policy § 7(B)(1)(i) (stating that start-up costs "are normally defined in a budget request, negotiated and added to the Section 106(a)(1) amount"); BIA Policy § 7(B)(1)(ii) (stating that pre-award costs "are computed on the basis of actual expended cost[s], are reimbursable, and are subject to review and approval by the Awarding Official").

34. The BIA Policy also set out a process for allocating CSC funding into several different "pools" of funding. "Pool 1" covered CSC funding for "new and expanded awards,"

BIA Policy § 8(A), which were to be paid from the so-called "ISD Fund" on a one-time, non-recurring basis, *id.* § 8(A)(1). Pre-award, start-up, and initial-year CSCs were all funded as Pool 1. *Id.* Subsequent-year recurring CSCs were funded and paid separately as Pool 2. BIA Policy § 8(A)(2).

35. According to the BIA Policy, each fiscal year the BIA Central Office would collect all of the BIA Awarding Officials' negotiated and approved tribal pre-award, start-up, and initial-year CSC requests nationwide for that year and wait until after July 2nd (*i.e.*, the end of the third quarter of the fiscal year) to allocate final funding from the ISD Fund (*i.e.*, Pool 1). *See* BIA Policy § 8(A)(1)(b).

36. If the ISD Fund had insufficient funds available for all of the tribal pre-award, start-up, and initial-year CSC amounts, then the BIA Central Office would fund tribes at a lesser *pro rata* amount without issuing any written declination decision. *See* BIA Policy § 8(A)(1)(b).

37. This BIA practice was unlawful because it violated the ISDEAA's requirement to approve or decline tribal contract proposals within 90 days. 25 U.S.C. § 5321(a)(2); 25 C.F.R. § 900.16-.22; *Puyallup Tribe of Indians v. Bureau of Indian Affairs*, 63 IBIA 10, 11 (Apr. 8, 2016); *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Bureau of Indian Affairs, Dep't of Interior*, 61 IBIA 98, 99 (Jul. 15, 2015).

38. This BIA practice was also unlawful because it violated the ISDEAA's requirement to provide full CSC funding, rather than *pro rata* funding, which the U.S. Supreme Court held to be illegal in *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 132 S. Ct. 2181 (2012).

**F. The *Ramah* Decision and Settlement.**

39. This action raises similar claims to those brought in *Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005), *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 132 S. Ct. 2181 (2012), and *Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 133 S. Ct. 22 (2012), *on remand Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 501 F. App'x 957 (Fed. Cir. 2012) ("*Arctic Slope II*").

40. In both *Ramah* and *Arctic Slope II*, the Supreme Court and the Federal Circuit rejected assertions by the Secretary of the Interior and the Secretary of Health and Human Services ("HHS"), respectively, in connection with CSC underpayments made to other contracting tribes. 132 S. Ct. at 2186; 501 F. App'x at 959. Both courts held that the respective Secretaries' failure to pay CSCs in full was a breach of contract. *See* 132 S. Ct. at 2090-91; 501 F. App'x at 959.

41. The *Ramah* case involved a class action of all tribes nationwide that contracted with the BIA under the ISDEAA. The class alleged unlawful underpayment of CSCs over many years. The BIA's position and practice was that since the agency did not have sufficient aggregate appropriations from Congress to pay all tribal contractors their CSC costs in full, the BIA would reduce each tribal contractor's CSC amount using uniform *pro rata* reductions. 132 S. Ct. at 2187.

42. In June 2012, the Supreme Court rejected the BIA's position and held based on ordinary Government contracting principles, that so long as the Government has appropriations available to pay any individual tribal contractor's CSC funds in full, then "the Government must pay each tribe's contract support costs in full." 132 S. Ct. at 2186; *see also id.* at 2190-91.

43. During FY 2010, all claims for unpaid CSCs – like those at issue in this case – were considered part of the *Ramah* class action.

44. After the *Ramah* Supreme Court decision in 2012, the United States and the class representatives began a series of meetings to negotiate a settlement of nearly two decades' worth of claims for unpaid CSCs. These negotiations took nearly three years to complete, and a final settlement agreement was filed with the court in September 2015. This final settlement agreement was approved by the federal district court on March 2, 2016. *See Ramah Navajo Chapter v. Jewell*, Case 167 F. Supp. 3d 1217 (D.N.M. 2016).

45. The *Ramah* settlement specifically reserves "[a]ny individual claims for pre-award or start-up costs under 25 U.S.C. § 5325(a)(5) or (6) which arose in the settled years," fiscal years 1994 through 2013. Final Settlement Agreement, § IV(B)(1)(b), *Ramah Navajo Chapter v. Jewell*, 167 F. Supp. 3d 1217 (D.N.M. 2017).

46. This reservation of claims in the final, approved *Ramah* settlement clearly and explicitly includes the Tribes' claims for unpaid pre-award and start-up costs at issue in this action. While the Tribes' original CDA claim also included the initial-year CSC payments, the Tribes have concluded that this part of the claim was settled as part of the *Ramah* class action settlement. Accordingly, the Tribes are not pursuing the initial-year CSC portion of the claim in this action.

**G. The Tribes' Law Enforcement and Corrections Contract History and Negotiations.**

47. The Tribes for many years have operated various federal programs, functions, services, and activities of the BIA on the Fort Hall Reservation pursuant to ISDEAA contracts between the BIA and the Tribes.

48. Starting in 2004, the Tribes contracted with the Secretary to provide both law enforcement and corrections services under a single ISDEAA contract, Contract No. CTP04T18041 (Sept. 2004).

49. In March 2007, the BIA requested that the Tribes enter into new and separate law enforcement and corrections contracts, rather than continuing with the Tribes' existing, combined Contract No. CTP04T18041 from September 2004.

50. Around this same time, in an effort to improve the conditions of public safety and justice on the Fort Hall Reservation, the Tribes undertook a construction project to build a new, state-of-the-art "Tribal Justice Center" to house expanded law enforcement and corrections programs – including the juvenile corrections program – along with the Tribal court and other related programs.

51. In April 2007, the Tribes agreed to negotiate new and expanded law enforcement and corrections contracts that would accommodate the BIA's request to split the contracts and include updated program standards, safety requirements, and operational protocols for the Tribes' expanded BIA law enforcement and corrections operations being housed in the new Tribal Justice Center.

52. The Tribes submitted a formal proposal to the BIA under the ISDEAA for new law enforcement and corrections contracts through a letter and attachments dated April 23, 2007.

53. The April 23, 2007 letter also provided notice that the Tribes were beginning to incur pre-award costs under the ISDEAA.

54. The BIA received the Tribes' April 23, 2007 contract proposals four days later, on April 27, 2007.

55. The Tribes and BIA held numerous in-person and telephone discussions about the contract proposals in 2008.

56. Following these negotiations, on June 23, 2009, the Tribes submitted a letter enclosing new, revised contract proposals for expanded corrections and law enforcement programs in the Tribal Justice Center, including assuming the juvenile corrections program and expanded facility operations.

57. The June 23, 2009 letter and its attached Tribal resolution provided further notice to the BIA that the Tribes were incurring pre-award costs for these efforts.

58. Overall, the contract negotiations for the new and expanded contracts were conducted over an approximately two-year timeframe – from 2007 to 2009 – and included many meetings between the Tribal negotiating team, senior BIA law enforcement and corrections officials at the BIA regional and headquarters levels, and the BIA Awarding Official.

59. The Tribes and the BIA spent several of these meetings specifically negotiating the precise amount of pre-award and start-up costs to which the Tribes were entitled under the expanded contracts.

60. During the negotiation period, the Tribes updated the BIA from time to time on the pre-award budgets for the new contracts.

61. On September 30, 2009, the Tribes and the Secretary executed two new contracts for FY 2010 – one for law enforcement (Contract No. CTP04T18048) and one for juvenile and adult corrections (Contract No. CTP04T18049).

62. Per the BIA Policy, the BIA and the Tribes negotiated the pre-award, start-up, and initial-year CSC amounts that would be due and agreed on a total amount of $2,984,825. Of this

total amount, $245,842 was for pre-award and $1,387,858 was for start-up. The remainder was for initial-year CSC funding.

63. The BIA Awarding Official handling the contract negotiations for the agency agreed that the total pre-award, start-up, and initial-year CSC budget amount was appropriate as the product of good faith tribal-BIA negotiations and forwarded the budget to BIA Headquarters for payment under the BIA CSC Policy.

64. Nine months later, on August 16, 2010, BIA Headquarters allocated the Tribes' final pre-award, start-up, and initial-year CSC funding award for FY 2010. BIA Headquarters officials did not object to any item of pre-award or start-up costs included in the negotiated budget. Instead, the BIA informed the Tribes that the agency did not have sufficient appropriations to satisfy all tribal pre-award, start-up, and initial-year CSC requests in FY 2010, and that all tribes with new and expanded contracts, including the Tribes, would receive only 33.2% of "ISD Fund" (*i.e.*, Pool 1) requests. For the Tribes, this 33.2% *pro rata* share amounted to $990,920 in pre-award, start-up, and initial-year CSCs from "ISD Funding" (*i.e.*, Pool 1).

65. Three days later, on August 19, 2010, the BIA issued contract modifications awarding the Tribes a *pro rata* share of funding for the pre-award, start-up, and initial-year CSCs for the new and expanded law enforcement and corrections contracts. These modifications stated explicitly that the funding amounts constituted "33% of start-up request."

66. The Secretary did not issue a declination (or partial declination) under the ISDEAA for any of the costs in the Tribes' final proposed and agreed-upon pre-award and start-up budgets – not within the 90-day deadline set forth in the ISDEAA, nor at any time thereafter.

67. The Tribes' full budgets were approved by the agency. But, even if that were not the case, the Tribes' full pre-award and start-up cost budgets were deemed approved by operation of law because the Secretary did not issue a timely declination. 25 C.F.R. § 900.18; *Seneca Nation of Indians v. U.S. Dep't of Health & Human Servs.*, 945 F. Supp. 2d 135, 145 (D.D.C. 2013); *Cheyenne River Sioux Tribe v. Kempthorne*, 496 F. Supp. 2d 1059, 1068 (D.S.D. 2007); *Puyallup Tribe of Indians v. Bureau of Indian Affairs*, 63 IBIA 10, 11 (Apr. 8, 2016); *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Bureau of Indian Affairs, Dep't of Interior*, 61 IBIA 98, 99 (Jul. 15, 2015).

68. The BIA acted illegally by paying the Tribes "on a uniform, pro rata basis," instead of paying the Tribes for their full pre-award and start-up amounts. *See Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2186, 2187 (2012).

69. Of the $122,921 of negotiated and approved pre-award funding for the law enforcement contract, the BIA paid only $40,826, an illegal underpayment of $82,095.

70. Of the $122,921 of negotiated and approved pre-award funding for the corrections contract, the BIA paid only $40,826, an illegal underpayment of $82,095.

71. Of the $827,774 of negotiated and approved start-up funding for the law enforcement contract, the BIA paid only $274,808, an illegal underpayment of $552,966.

72. Of the $560,084 of negotiated and approved start-up funding for the corrections contract, the BIA paid only $185,970, an illegal underpayment of $374,114.

73. The total illegal underpayment by the BIA for the Tribes' pre-award and start-up costs was $1,091,270.

### H. Tribes' Claim Presented to BIA, Deemed Denied, and Now Appealed.

74. In a letter dated May 13, 2014, the Tribes presented a claim to the BIA for FY 2010 for the unpaid pre-award costs, start-up costs, and initial-year CSCs. The Tribes sought "without limitation, all other damages arising out of the BIA's failure to pay full pre-award and start-up costs and initial-year CSCs, as required by the ISDEAA and the Tribes' contracts."

75. The BIA Awarding Official has not rendered any final decision on those claims, and the Tribes now deem the BIA Awarding Official's inaction to be a denial of the claims pursuant to 41 U.S.C. § 7103(f)(5). The Tribes timely appeal to this Court from that "deemed" denial.

76. The Tribes specifically appeal the "deemed" denial of the pre-award cost and start-up cost portions of the claims only. The Tribes do not appeal the "deemed" denial of the initial-year CSC portion of the claims.

## V. FIRST CAUSE OF ACTION
## (Breach of Contract and Statute)

77. The Tribes incorporate all previous allegations of fact and law into this Cause of Action.

78. In the *Cherokee*, *Ramah*, and *Arctic Slope* decisions, the Supreme Court and the Federal Circuit affirmed the Government's duty to fully pay ISDEAA contracts.

79. The Tribes' new and expanded contracts for the law enforcement and corrections programs required the Secretary to fully fund the Tribes' proposed and agreed-upon pre-award and start-up funding amounts. The Tribes' FY 2010 contracts were entered into under the

ISDEAA and incorporated the statutory provisions of the ISDEAA requiring full payment of these costs.

80. The Secretary never issued a formal declination (or partial declination) under the ISDEAA for the Tribes' proposed pre-award and start-up costs for the new and expanded FY 2010 law enforcement and corrections contracts, so the Tribes' final proposals for these amounts are "deemed approved" by operation of law and are part of the contracts between the Secretary and the Tribes.

81. Despite the Secretary's duty to pay the Tribes the full contract price for these contracts, the Government failed to do so, breaching both its statutory duties and its contractual obligations with the Tribes. The Secretary unlawfully pro-rated the agreed-upon and required pre-award and start-up funding, ultimately paying only 33.2% of these amounts. In the *Cherokee*, *Ramah*, and *Arctic Slope* decisions, the Supreme Court and the Federal Circuit held that such *pro rata* payment violated the Government's contractual and statutory duties to pay tribal contractors in full.

82. General contract principles control the calculation of damages in government contract litigation. This is so because "'[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)). *See also Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 607–08 (2000) (quoting *Winstar* and relying on the Restatement (Second) of Contracts (1981) ("Restatement")); *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (quoting *Mobil Oil* and applying principles of general contract law).

83. General contract law on the issue of damages is clear: a contractor is entitled to damages which will protect "his 'expectation interest,' which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed . . . ." Restatement § 344(a).

84. In order to fulfill the Tribes' "expectation interest" arising from the Secretary's breach of contract for failing to pay the contract amount owed, the Tribes are entitled to damages, as set forth below.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Shoshone-Bannock Tribes of the Fort Hall Reservation pray that this Court grant the following relief:

(a) A declaratory judgment (i) that the Secretary acted in violation of the ISDEAA by failing to pay the Tribes the full amount of pre-award and start-up funding that the Tribes were due under the Tribes' FY 2010 contracts with the Secretary; and (ii) that the Secretary breached his contracts with the Tribes by failing to pay the full pre-award and start-up funds that were due to the Tribes for the Tribes' FY 2010 contracts with the Secretary; and

(b) A money judgment for the amount due to the Tribes in the amount of $1,091,270 as a result of the Secretary's breaches of contract and violations of the ISDEAA; and

(c) Interest for one year from the payment due date for each payment the Secretary failed to make under each contract, as provided for under the Prompt Payment Act, 31 U.S.C. §§ 3901–3907; and

(d) Interest under the Contract Disputes Act, 41 U.S.C. §§ 7101–7109, from the date of the claim until the date of payment upon entry of final judgment; and

(e) Such other monetary, declaratory, and equitable relief as this Court may find to be just.

Respectfully submitted this 19th day of May, 2017.

SONOSKY, CHAMBERS, SACHSE
ENDRESON & PERRY, LLP

By: ______________________________
James E. Glaze
D.C. Bar No. 467147
1425 K Street NW, Suite 600
Washington, DC 20005
Tel.: (202) 682-0240
Fax: (202) 682-0249
jglaze@sonoskysd.com

William F. Stephens
D.C. Bar No. 234222
1425 K Street NW, Suite 600
Washington, DC 20005
Tel.: (202) 682-0240
Fax: (202) 682-0249
wstephens@sonosky.com

Rebecca A. Patterson
*Pro hac vice pending*
(Office not located in District of Columbia)
AK Bar No. 1305028
900 West Fifth Avenue, Suite 700
Anchorage, AK 99501
Tel. (907) 258-6377
Fax. (907) 272-8332
rebecca@sonosky.net

## Certificate of Service

I hereby certify that on the 19th day of May, 2017 a true and correct copy of the foregoing **COMPLAINT** was served via Electronic Case Filing and U.S. Mail Certified Return Receipt Requested upon:

Ryan Zinke, Secretary
U.S. Department of Interior
1849 C Street NW, Mail Stop 7328
Washington, D.C. 20240

Michael S. Black, Acting Ass't Secretary-
Indian Affairs
U.S. Department of Interior
1849 C Street NW, Mail Stop 4606
Washington, D.C. 20240

Jefferson B. Sessions, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Channing Phillips, U.S. Attorney
for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

William F. Stephens, *Attorney for the Plaintiff*